It is here established that the defendant against whom, upon its face, this judgment purports to have been rendered had been dissolved, and thus ceased to be a corporation or an existing person before the judgment was obtained. From the nature of things, the court, upon the dissolution of the corporation, lost jurisdiction over its person. It could have no jurisdiction over a person that had ceased to exist, and neither the acts of the legislature nor the action of the court could confer a jurisdiction which, by the dissolution of the corporation, had been rendered impossible. No act of the legislature of the state of Illinois could give its courts jurisdiction over the person of a nonresident not served with process within the state. No action of a court of the state of Illinois could give it jurisdiction over a nonresident, who was not within its jurisdiction, had not been served with its process, or who had not appeared in the proceeding. Nor could any authority or consent given by a corporation survive its extinction by the judgment of dissolution. It was entirely competent for the state of Illinois to direct that a judgment be entered in form against a dissolved corporation, although its courts had lost jurisdiction over it by its dissolution, and to direct that such a judgment should affect property which had belonged to the corporation located within the state. With such exercise of power no other state has any concern; but it is entirely incompetent for the state of Illinois to say that a judgment that its court shall enter against a nonexisting corporation or individual who is not before the court, over whom it has and can obtain no jurisdiction, shall be conclusive evidence as against persons not parties to the record, in other states, and shall affect property which has ceased to be the property of the judgment debtor. We give full faith and credit to this judgment when we hold that it was valid in the state of Illinois, and affects property and persons within the jurisdiction of that state. That was the effect that the law of the state of Illinois gave to such a judgment, and all that the courts of this state are required to give to it.

The order appealed from is right, and should be affirmed, with costs. All concur.

---

## MILLER v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Third Department.   November 19, 1901.)

RAILROADS — ACCIDENT AT CROSSING — NEGLIGENCE — EVIDENCE—PREPONDERANCE.

In an action against a railroad company for injuries at a crossing by a collision between one of defendant's engines and a vehicle in which plaintiff was riding, plaintiff and the two persons with whom she was riding testified that they heard no signals. The engineer and fireman testified that 1,320 feet from the crossing three whistles were given, and the automatic bell was started, which continued to ring until after the accident. A person living six rods from the crossing, and one who crossed the track just before the accident, testified to hearing the whistles and bell. *Held*, that a judgment for plaintiff would be reversed, owing to her not having shown negligence on the part of defendant by a preponderance of the evidence.

Appeal from trial term, Franklin county.

Action by Margaret C. Miller against the New York Central & Hudson River Railroad Company. From a judgment in favor of plaintiff, and from an order denying a motion for a new trial, defendant appeals. Reversed.

Argued before PARKER, P. J., and KELLOGG, EDWARDS, SMITH, and CHASE, JJ.

Martin E. McClary, for appellant.

Badger & Cantwell, for respondent.

EDWARDS, J. This action was brought to recover damages for injuries sustained by the plaintiff in consequence of the alleged negligence of the defendant, causing a collision between one of its engines and a vehicle in which the plaintiff was riding on July 25, 1900. The plaintiff recovered a verdict for $1,000. The collision occurred at the intersection of the defendant's railroad, running northerly and southerly, with the highway running easterly from the village of Malone. The railroad crosses the highway at grade. The defendant's road at and south of the crossing was constructed through a cut, and there was on the west side of the road, south of the highway, quite a high bank, which obstructed the view of travelers going east on the highway of any train south of the crossing until at a point about 50 feet west of the track. The approach to the crossing from the west is up a hill until within about 64 feet from the crossing. A person standing at that point on the highway, 64 feet westerly from the track, could see only the top of a rod 13 feet high standing 135 feet southerly from the crossing. Fifty feet westerly from the track one could see up the track, southerly, about 150 to 200 feet. Within the distance of 40 feet from the crossing there is an unobstructed view of the track south for 1,000 feet. The plaintiff, on the occasion in question, was, on the invitation of Millar Shonyo, riding in a top carriage with him and his wife, proceeding westerly on the highway leading from the village of Malone. Shonyo, the driver, was in the middle of the seat, sitting on a mackintosh, rolled up, between his wife on the south side of the carriage and the plaintiff on the north side. Shonyo says that when he got at the top of the hill, about 10 rods from the track, he put his head outside of the carriage, the top of which was up, and looked out on the right-hand or south side, and listened, but did not hear any engine coming; that he tried to look south for a coming train, but the bank obstructed his view. He started the horse into a small jog, and as they came around the bank where he could see the track southerly he saw an engine of the defendant running backwards; that his head had been out and he had been looking all this time. When he discovered the engine, the horse was 10 or 12 feet from the track. He pulled up the horse as soon as he could, and the horse stopped with his forward feet over the first rail, when the engine struck him, the carriage was smashed, and the occupants thrown into the ditch. Shonyo's wife and the plaintiff also say that Shonyo, the driver, was looking out of the carriage southerly all the time until the collision. Mrs. Shonyo says that she was looking out of the front of the carriage at the automatic bell on

the north side of the highway and west of the track. The plaintiff says that she was sitting on the left-hand side looking out at the front of the carriage directly to the north at the automatic alarm bell. On the question whether the defendant gave any signals of the approach of the locomotive there was a conflict of testimony. Shonyo says that from the time he was 40 feet from the track until he was 30 feet he was listening for the bell on the engine and the automatic bell at the crossing and for a whistle, and heard none. Mrs. Shonyo says that during the time her husband was looking to the south she was listening to see if she could hear any whistle or bell, but did not hear any, nor see the engine until it struck. The plaintiff says that she was watching the automatic bell at the crossing, and was listening for any sound, particularly of this bell, and did not hear any. On the part of the defendant, the engineer, Black, testified that he gave two long and two short blasts at the whistling post, 1,320 feet from the crossing, and started the automatic bell on the engine, which continued to ring until after the accident; that he was about 200 feet from the crossing when he first saw the carriage, and at once applied the brake and reversed the engine. Feeney, the fireman, also testifies to the blowing of the whistle at the whistling post, to the ringing of the automatic bell on the engine after the blowing of the whistle, and that it was ringing when they reached the crossing. Bridget White, who lives about five or six rods east of the crossing, says that before the accident she heard the signal bell ring, then heard a whistle blow. The engine was coming from the south. When she first saw it, it was 40 or 50 feet south from the crossing, and the whistle was blowing. She could not swear that she heard the bell on the engine ring, but she heard the automatic bell at the crossing and the whistle. She says the automatic bell begun to ring before she saw the engine. James McGrath, who lives about 50 rods from the crossing, says that at the time of the accident he was going west towards the crossing; that he heard the engine whistle, and later heard both bells,—the stationary bell and the bell on the engine; that he heard the whistle blow and heard the bell at the crossing ring before he saw the engine. Napoleon Forkey says he crossed the track just before the accident; that while crossing he stopped, looked up the track, southerly, and saw the engine coming; that he stopped to see if it would whistle, and heard it whistle two or three times. He walked 40 or 50 feet, and met the carriage, and turned around, and called out to them that an engine was coming, which Shonyo and the plaintiff say they did not hear. He says he heard the bell at the crossing ring before he saw Shonyo; that it was ringing when he stood at the crossing and when he left the crossing and walked towards plaintiff's carriage.

Although the testimony of the plaintiff's witnesses as to the absence of the signals is not of a mere negative character, I think it apparent that while they were proceeding towards the track, by reason of the rumbling of the carriage or some other circumstance, their attention must have been so diverted that they failed to hear the signals which were clearly proven by the officers of the defendant in charge of the locomotive and three disinterested witnesses to

72 N.Y.S.—55

have been actually given. It is undisputed that the automatic bell at the crossing was ringing immediately after the collision. Upon the entire evidence in the case we are satisfied that the plaintiff has not fully carried the burden which the law places upon her to establish the negligence of the defendant by a preponderance of evidence, and that justice requires a reversal of the judgment and a new trial.

Judgment and order reversed, and new trial granted, with costs to appellant to abide event. All concur.